### Shelley W. MOORE
### v.
### UNITED STATES of America.
### Civ. A. No. 4571.

United States District Court
N. D. Texas,
Fort Worth Division.
Dec. 31, 1962.

Charles Wheeler, Fort Worth, Tex., for plaintiff.

Wm. L. Hughes, Jr., Robert Travis, Asst. U. S. Attys., Fort Worth, Tex., for Government.

BREWSTER, District Judge.

The petitioner brings this action apparently under Section 2255, Title 28, U.S.C.A., seeking to vacate a judgment entered by this Court against him on December 11, 1961, in Criminal Action No. 10,212, United States vs. Shelley W. Moore.

The indictment in the criminal action contained three counts charging the defendant respectively, first, with selling marihuana in violation of Section 4742

(a), Title 26, U.S.C.A., second, with selling marihuana in violation of Section 176a, Title 21, and third, with selling narcotic drugs consisting of powdered opium and a number of opium derivatives in violation of Section 4705(a), Title 26.

The defendant was sentenced to fifteen years upon his plea of guilty to the first count. The other two counts were then dismissed upon motion by the government.

The validity of the plea of guilty and the judgment of conviction was not challenged until the filing of the original motion herein almost ninety days after conviction. An amended motion later filed, and the affidavits attached thereto, when construed together with the supplemental petition and exhibits, allege that petitioner's sentence was imposed in violation of the Constitution and laws of the United States for each of the following reasons:

1. The petitioner was induced to plead guilty by the misrepresentation of his own attorney that arrangements had been made with the United States Attorney whereby the petitioner would receive no more than the minimum sentence of five years, if he would enter a plea of guilty to the first count of the indictment.

2. The petitioner was induced to commit the offense in question through entrapment by government agents.

3. The petitioner received a heavier sentence than would ordinarily have been imposed because of his refusal to answer certain questions during the sentence proceedings about the identity of the persons he claimed were the source of his supply of marihuana and narcotics.

The defendant insists that he be brought back to Fort Worth, Texas from the penitentiary at Leavenworth, Kansas for a hearing on his motion.

The motion and the affidavits supporting it were prepared by an attorney employed by the defendant; but the attorney is not the same as the one retained by defendant to represent him on the trial of the narcotics case.

The quotation set out below, taken from petitioner's own affidavit filed in support of his motion, gives what he now claims were the inducements for his entering a plea of guilty to the first count. "Mr. (*attorney*)" in the part quoted refers to the attorney the defendant had selected and employed to represent him in the narcotics case. He is mentioned by name in the affidavit; but his name is omitted here in view of the lack of justification for the charges. The affidavit says in this connection:

"I had retained Mr. (*attorney*) as my attorney, when I was arrested in early January, 1961, some two months after I had done this. Shortly after I was put in the Tarrant County Jail, I retained Mr. (*attorney*) a Fort Worth attorney, to represent me in my case. On October 31, 1961, I was advised by a letter from Mr. William L. Hughes, Jr., assistant United States attorney, that my case would be called on November 17, 1961, at 9:00 o'clock A.M. Shortly after this, I went to see Mr. (*attorney*) concerning my case, and we discussed it. *I informed Mr. (attorney) that in view of the fact that there were two other counts in the indictment against me besides the one on which I was convicted, I felt that I would prefer to plead guilty rather than to try to establish my defense on all three counts, since I might receive the maximum sentence on each of the counts and have them made to serve one after the other rather than concurrently.* However, I informed Mr. *(attorney)* that I would not plead guilty and that we would fight the case to the limits unless I was assured of receiving the minimum sentence. I asked Mr. *(attorney)* to contact the United States Attorney to see if an arrangement could be made with the U. S. Attorney for me to plead guilty, in return for their dismissal of two of the counts of the indictment, and their recom-

mendation that I would receive no more than five years.

"Mr. (*attorney*) told me that he would see what could be done. A few days before the date for my trial, I went to see Mr. (*attorney*) again, and when I walked in, he was all smiles. He told me that everything was fixed, that the U. S. Attorney had agreed to dismiss two of the counts of the indictment, and that I should receive no more than five years. *I did not personally talk to the United States Attorney, nor do I actually know what arrangements or agreements had been made between Mr. (attorney) and the U. S. Attorney.* However, I do know what Mr. (*attorney*) led me to believe. That was, that two of the counts of the indictment would be dismissed and that I would receive the minimum sentence of five years." (Emphasis ours).

■ From the motion, the affidavits filed by petitioner in connection therewith, and the files and records of the case, the Court is of the opinion that the petitioner is not entitled to have the judgment vacated, and that he should not be brought back from the penitentiary for a hearing on the motion, because the grounds alleged in the motion, even if taken as true, are not adequate for each of the following reasons:

■ 1. *Misrepresentations to accused by his own counsel, in the absence of collusion between such counsel and the prosecution are not enough.* In United States v. Sehon Chinn, D.C.W.Va., 74 F.Supp. 189, 191, the petitioner claimed that he was induced by misrepresentations of his own counsel to enter a plea of guilty. In overruling the motion the Court said at p. 191: "* * * It is well settled that a defendant is not entitled to withdraw his plea of guilty because of defendant's expectation of leniency, in the absence of a showing that such expectation was improperly induced by the prosecution. United States v. Weese, 2 Cir., 145 F.2d 135. *Petitioner does not charge that the prosecution in*

*any manner knew or participated in such alleged misrepresentation.*" (Emphasis ours). The Court of Appeals for the Fourth Circuit affirmed the judgment denying the motion and approved the opinion of the trial court. Sehon Chinn v. United States, 163 F.2d 876. See also Ridgeway v. U. S., 6 Cir., 205 F.2d 680, and Meredith v. U. S., 4 Cir., 208 F.2d 680. To hold otherwise, would, to use the language of the Court in the Weese case, put an accused in a position where he could "safely indulge in a plea of guilt as a mere trial balloon to test the attitude of the trial judge, being reasonably secure in the knowledge that he can withdraw it without difficulty."

■ 2. *A judgment of conviction cannot be collaterally questioned on the basis that the defendant was entrapped by representations of the government.* Kaye v. U. S., 6 Cir., 235 F.2d 187; Stanley v. United States, 9 Cir., 239 F.2d 765; Way v. U. S., 10 Cir., 276 F.2d 912; Ellison v. U. S., 10 Cir., 283 F.2d 489. In the Way case, the Court cited Horne v. U. S., 5 Cir., 264 F.2d 40, as one of the authorities for the statement at p. 913 of 276 F.2d: "The next contention is that the conviction was secured upon evidence establishing entrapment which entitled Way to an acquittal. This defense was not raised in either the trial court or in the appeal. A motion under Section 2255 to vacate a sentence is a collateral proceeding in which errors in procedure on the initial trial of the case are not open for review. Here the defense of entrapment is raised for the first time in this Section 2255 proceeding and, hence, comes too late."

■ 3. *The sentence imposed was within the range authorized by statute.* Sections 4742(a) and 7237(b), Title 26, U.S.C.A. *It is therefore not subject to attack as being excessive.* Holmes v. U. S., 8 Cir., 115 F.2d 528, 529; Lipscomb v. U. S., 8 Cir., 273 F.2d 860, 864; Friedman v. U. S., 8 Cir., 200 F.2d 690; Meredith v. U. S., 4 Cir., 208 F.2d 680; Sweeden v. U. S., 8 Cir., 209 F.2d 524, 527; U. S. v. Page, 2 Cir., 229 F.2d 91, 92.

4. *The willingness or unwillingness of the defendant to give information as to the identity of his alleged suppliers of marihuana and narcotics, and his demeanor in connection therewith, were proper circumstances to take into consideration in this case on the question of penalty.*

The reasons above given show that even if everything the petitioner alleges were true, he would not be entitled to have his sentence vacated. Under ordinary circumstances the opinion would end here; but there are additional grounds for refusing the motion that ought to be discussed in justice to those whom the petitioner now falsely accuses. There is nothing that gives substantiality or any degree of credence to the allegations of the motion and the statements in the affidavits filed by petitioner in connection therewith. Scott v. United States, 6 Cir., 292 F.2d 49, and United States v. McNicholas, 4 Cir., 298 F.2d 914, hold that a motion to vacate a sentence is properly refused without a hearing where there is nothing in the record "to give substantiality to the allegations contained in the motion" (298 F.2d 917); where there is no "real degree of credence to the facts alleged in the motion" (298 F.2d 917); where the allegations "on the face of this record [are] incredible" (298 F.2d 917); or where the files and records in the case adequately refute the allegations in defendant's motion (292 F.2d 51).

In the Scott case, supra, the petitioner moved to set aside his conviction upon his plea of guilty on the grounds that he was under the influence of drugs when he entered his plea, and that his plea was induced by fraud of the prosecution. In upholding the action of the trial court, the Court of Appeals said:

"The District Judge pointed out that there was no controversy with respect to the Court's files and records and that the transcript adequately refuted the allegations contained in appellant's motion, that such allegations constituted mere denials of fact which he readily admitted at his arraignment and were insufficient to raise substantial issues of fact within the meaning of United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232, or to invoke the power of the Court under Section 2255, Title 28, U.S.Code, or under Rule 32(d), Rules of Criminal Procedure. The District Judge held that the files and records of the Court showed that the appellant was not entitled to relief. The motion was denied without a hearing and the proceeding dismissed, followed by this appeal, at which appellant is represented by competent court-appointed counsel. Appellant's main contention is that he was improperly denied a hearing by the District Judge.

"We concur in the rulings of the District Judge. * * *"

Ridgeway v. U. S., 6 Cir., 205 F.2d 680, applied the rule to facts strikingly similar to those in the present case in upholding the trial court's refusal of a motion to vacate.

There is no controversy about the records and files in this case. The author of this opinion is familiar with them from having presided over all of the proceedings connected with this matter. That the petitioner himself realizes that they conflict with his present allegations is shown by the following quotation from his own affidavit attached to his petition: "When my case came up for hearing, my wife and I went to the United States Courthouse with Mr. *(attorney)*, and went in and plead guilty early in the morning of December 11, 1961. *I was asked by the Judge whether I had been induced into pleading guilty by any promises of leniency, executive clemency, threats or otherwise.* Mr. *(attorney)* had told me to say no when the Judge asked me this. I accordingly informed the Court no. * * *" (Emphasis ours).

In other words, the petitioner institutes this proceeding with the statement, in effect, that he told a story during the sentence proceedings that was directly

opposite from the one he is telling now; but that the first one was deliberately false.

The narcotics indictment against this defendant, along with a number of criminal cases against other persons, was called on November 13, 1961 for arraignment only. It was announced at that time that contested cases could not be disposed of until the following month. The defendant was on bond. He appeared with an able and experienced attorney, chosen and employed by him, and pleaded not guilty when he was arraigned.

When the defendant's case was called for trial before a jury on December 11, 1961, the attorney who had appeared for him on arraignment stated that the defendant desired to withdraw his plea of not guilty on the first count and to enter a plea of guilty thereto. The following statement heretofore quoted from petitioner's affidavit shows that the idea of changing the plea originated with him: " * * * Shortly after this (the arraignment), I went to see Mr. *(attorney)* concerning my case and we discussed it. *I informed* Mr. *(attorney) that in view of the fact that there were two other counts in the indictment against me besides the one on which I was convicted, I felt that I would prefer to plead guilty* rather than to try to establish my defense on all three counts, *since I might receive the maximum sentence on each of the counts and have them made to serve one after the other rather than concurrently."* (Emphasis ours).

It was nothing unusual for an accused to plead not guilty on arraignment day and then later change his plea to guilty, when, by so doing, he could postpone imprisonment for even a few weeks. The following statement in the affidavit of petitioner's wife shows that he had in mind delaying the beginning of service of sentence as long as possible: " * * * Also we asked Mr. *(attorney)* to file notice of appeal, so that my husband could be free for some period of time before he was sent to the penitentiary * * *." However, in view of the change

of plea, extra precaution was taken in this case, before the plea of guilty was accepted, to see that it was being entered understandingly, advisedly and voluntarily, without any coercion or improper inducement, and solely because the defendant was guilty and for no other reason. The following is quoted from the transcript in the sentence proceedings:

"THE COURT: Mr. Moore, have you been promised *anything* to get you to plead guilty?

"MR. MOORE: No.

"THE COURT: Has *anybody* held out *any favor* or *hope of consideration* or *extra consideration* or *anything like that* if you would plead guilty?

"MR. MOORE: No.

"THE COURT: Has anybody tried to coerce you into pleading guilty through threats, force or otherwise?

"MR. MOORE: No.

"THE COURT: Are you pleading guilty *voluntarily, just because you are guilty, and for no other reasons?*

"MR. MOORE: Yes, sir." (Emphasis added).

That the defendant fully understood and realized that such interrogation was intended to reach the very matter that is now the basis of his complaint is shown by his explanation in connection with the statement heretofore quoted from his own affidavit to the effect that he was asked by the Court whether he "had been induced into pleading guilty by any promises of leniency".

The defendant's attorney was known to the Court to be mature, able and experienced in criminal cases in both state and federal courts. He had the disposition and willingness to contest a case if anything could be gained by it. His loyalty to his clients had never been questioned. He was familiar with the practice of the judges in this district not to discuss penalties with counsel for either side or to ask for recommendations from the prosecution in connection therewith.

This was not a case involving a youth who was a novice in crime, or an accused who was ignorant, uneducated or inexperienced. The defendant was thirty years old. He had spent some time in college. Before hard work and honest people got too dull for him and he became a hoodlum, he had worked for others and had had his own business for a while. Pleading guilty to a felony was no amateur performance for him. He had previously been convicted on a plea of guilty to a charge of committing burglary for the purpose of cracking a safe.

Under the circumstances as they existed on the sentence hearing, confirmed as they are by petitioner's admissions in his affidavit filed in this proceeding, there can be no question about his having fully understood what he was doing when he entered his plea of guilty and answered the Court's questions in connection therewith.

The petitioner's explanation given in his affidavit that he lied to the Court about promises of leniency, because his attorney told him to do so, does not help him in this proceeding. The effect of his position is that he is willing to lie to a court if he thinks there is anything to gain by it. It relieves the Court from attaching any credence to his claims. The references and quotations from the record given above positively refute the allegations in the petitioner's motion that he was improperly induced to enter his plea of guilty, and bring this case within the rule announced in the Scott and Ridgeway cases, supra.

The third ground of petitioner's motion is that he received a heavier sentence than would otherwise have been imposed on him because the Court lost patience with him when he said he had consistently refused to identify the person he claimed was his supplier of marihuana and narcotic drugs. The petitioner's assertion that the Court let his personal feelings influence the sentence is false; but the defendant's position and his attitude in connection therewith were taken into consideration in appraising him and in evaluating the case. A defendant is entitled to know the reasons for his sentence; and this matter will therefore be discussed further here with the hope that an understanding of the factors considered in fixing his sentence will prevent the repetition in this case of motions of this type that now so frequently follow assessment of a substantial penalty.

The Court came to the conclusion from the facts and circumstances before him at the time of the sentence hearing, and from a close observation and evaluation of the defendant himself, that the defendant was a principal in a vicious ring of safecracking burglars who were involved in the traffic of marihuana and narcotic drugs. The Court further concluded from his observation of the defendant himself, from the nature of the offense involved, closely connected, as it was, with other vicious crimes, from the defendant's connection with and status among the sorriest hoodlums in the underworld, and from the defendant's failure to respond to prior leniency, that the chance of his reform was very remote.

To begin with, there was mention of the fact that defendant's wife had a job, but there was no credible showing that he had done any honest work since prior to the time of his conviction on the burglary charge, more than two years before. Every mention of his activities during that time involved his loafing and loitering around beer lounges in association with the most dangerous type of criminals. In answer to some inquiries by this Court about his associates in the safecracking burglary for which he was convicted, the defendant stated that each one of them received a penitentiary sentence. The following then transpired:

"THE COURT: How did you get mixed up with them—by hanging around and drinking beer with them?

"MR. MOORE: Yes, sir."

The following statement made by defense counsel during the sentence proceedings, in explanation of the defendant's connection with the traffic in marihuana and narcotic drugs, shows that

if the picture had changed two years later, it was only for the worse: " * * * This defendant was guilty of hanging around bars and of knowing some people who apparently came into the possession of some narcotics, *some narcotics out of the burglary*. A special agent—special employee of the United States Government who himself was under federal charges in several cases came to this boy and during the course of that conversation he, that special employee of the United States Government, according to his statements, or Shelley Moore, let it be known that he knew the *safe burglar*, or whoever had it, had this *quantity of drugs*. Then an agent was brought in by the special employee who was working with the special employee, and *Mr. Moore told him that he could get this stuff* and did go and bring it back and sell it to the agent * * * ". (Emphasis added). This "boy", as counsel called the defendant in the statement quoted, was, as has been previously stated, thirty years old.

The following occurred near the end of the sentence proceedings:

"THE COURT: What is his explanation for not having responded to the leniency that was shown him on the burglary case? He went right back to hanging around burglars and that kind of people, and is helping them out and then protecting them in it.

"MR. *(Attorney)*: That is his fault, Judge, hanging around them and getting involved to that extent * * * ."

While the count of the indictment to which the defendant pleaded guilty charged the sale of marihuana, most of his counsel's statements during the sentence proceedings were devoted to explaining the defendant's connection with "some narcotics out of the burglary" or with the "safe burglar" who had "this quantity of drugs." Marihuana is not a narcotic or a drug, and it would be most unlikely that it would be obtained in a safe burglary. The purpose of counsel's explanation was to mitigate the statement in the written sentence data sheet furnished the Court by the Government during the sentence proceedings that the following occurred after the marihuana sale in question: " * * * On or about December 22, 1960, the special employee met defendant at a location in Fort Worth, at which time the special employee received a list of narcotic drugs from defendant who stated that the list represented a quantity of narcotics which defendant had for sale. Defendant told the special employee to contact the agent and make arrangements to complete the sale. The special employee met agent English and gave him the list. On December 23, 1960, Agent English and the Special Employee joined defendant at a drug store in Fort Worth where the agent gave defendant $200 in exchange for narcotics." A copy of that sentence data sheet was delivered to counsel for the defendant and was in his possession during the sentence proceedings. The defendant was also furnished with a copy of a shorter sentence data sheet setting out only the facts relating to the marihuana sale to which he pleaded guilty. For some unknown reason, the shorter data sheet was read aloud by the United States Attorney rather than being given to the Court to read for himself. However, as is stated above, counsel for the defendant devoted most of his efforts to an attempt to explain the matters relating to narcotic drugs set out in the copy of the sentence data quoted from above. It will be noticed that the sale of narcotics mentioned in the sentence data sheet occurred on the date of the sale alleged in the third count of the indictment, which charged that the defendant sold the following narcotics: "demerol hydrochloride, tincture of opium, dionin, dolophine hydrochloride, dolophine tablets, pantopon and powdered opium." It was evident that defense counsel was referring to narcotic drugs of that type when he mentioned that the defendant's confederates had come into possession of "some narcotics out of the burglary". A quantity of such narcotics in the hands of safe burglars is usually stolen from a

safe in a drug store or a medical clinic. It was only common sense that the marihuana was stocked from other sources to attempt to make an inventory complete enough to satisfy almost any request from customers, as it could hardly have been expected that the marihuana came from a safe in a drug store or a clinic.

There is no intention here to minimize the seriousness of traffic in marihuana. It is true that cases involving relatively small amounts sold among users themselves are ordinarily dealt with more leniently than similar transactions involving opium derivatives. But the situation is different when a supplier of marihuana is on trial. The defendant was shown by statements of his own counsel to be a seller, and not a user. The evil effects of the illicit traffic in marihuana are serious, far-reaching and long lasting. Marihuana is often the opening wedge in the degradation of people who could never be reached originally by narcotic drugs. It is one of the strongest factors contributing to the basest form of juvenile delinquency. Young people, especially those of high school age, are particularly susceptible to it. Their inhibitions are dulled by use of it and their morals suffer. They are brought in contact with the lowest characters of the underworld, and the use of narcotic drugs frequently follows. Consideration of such factors undoubtedly had their influence in causing lawmakers to put marihuana on the same penalty basis as narcotic drugs. The Court's conclusion that the defendant was himself, along with some confederates, a supplier as well as a peddler of marihuana, when considered in connection with his character and his established status in the underworld, alone fully justified the penalty assessed. The facts concerning his connection with narcotics and the source from which they came show that the sentence was lenient under the circumstances.

There was no question about the fact that the Court had before it a transaction involving a vicious situation. A person engaged alone in peddling narcotics or marihuana or both, or in burglary, or in safecracking, is menace enough to society. Here, however, was a ring of criminals combining all those types of crime. The extensive list of narcotics, with the addition of marihuana to give a complete inventory, showed the widespread nature of the operations. It was, in an effort to determine the extent of the defendant's participation in that nefarious traffic that the Court made the inquiries that form the basis for the defendant's contention now being discussed. Those questions were:

"THE COURT: Did you tell the agents who these people were that supplied this marihuana?

"MR. MOORE: They knew who they were, yes, sir.

"THE COURT: Well, when they asked you who they were, did you tell them?

"MR. MOORE: I don't recall them asking me.

"THE COURT: Were they arrested?

"MR. MOORE: The man is in the penitentiary at the present time.

"THE COURT: The one that supplied you the marihuana?

"MR. MOORE: Yes, sir.

"THE COURT: Did he go up on a narcotics charge?

"MR. MOORE: I don't know, sir. I don't remember what the charges were.

"MR. (Attorney): Judge, to be quite frank with the Court, I think that is one thing that this defendant —he didn't tell the narcotics agent the name of the parties from whom he acquired this, although the agents, I am sure, knew. And he has never been willing to say he would go in and testify against them and supply information against them. He just says he got it at that house.

"THE COURT: Why would you be trying to protect people like that?

"MR. MOORE: *I just don't want to put anybody in the position that I am in. I would rather go ahead and serve my time.*" (Emphasis added).

The above questions were asked by the Court to determine if there was any basis for leniency. The search was for some indication that this defendant himself was not one of the principals in this ring, or, even if he was, that he showed some repentance and a desire to reform. The only such indication up to that time was that the defendant was admitting his wrong by entering a plea of guilty; but such a plea often results from the fact that, as a practical matter, the defendant feels that contest of his case would be futile. The petitioner's own affidavit filed in the present proceeding shows that it was the practical consideration, rather than repentance, that caused him to enter his plea of guilty. It appeared to the Court, at the time of the sentence proceedings, that if the defendant himself were not one of the principals in this ring of marihuana and narcotics peddling burglars, or that if he had any desire to reform, he would be willing to make some contribution toward stopping the illicit traffic. The people engaged in the sale of marihuana and narcotic drugs know more than anyone else the misery and lasting injury that follows the use of their products. The petitioner showed no regret or remorse for any suffering or injury that could have resulted from his involvement in the illicit traffic. He showed no desire to try to make amends by helping law enforcement officers. He did not even appear to have any shame about his conduct or his associates. It is true that, in some cases, fear prevents an accused in a narcotic case from identifying others involved in the racket. However, such was not the case here. The defendant's own statement, given with some degree of pride, was: "I just don't want to put anybody in the position that I am in. I would rather go ahead and serve my time." The only reasonable and logical conclusion from *all the circumstances* was that the defendant himself was as big and as deeply involved as any of his confederates in their illicit traffic, and that there was no one whom he could accuse as being a supplier over him.

One of the strong factors considered in evaluating this case was the defendant's standing in the lowest segment of the underworld composed of people who were making their living by burglary, safecracking and peddling marihuana and narcotics. Characters of that type would not have permitted the defendant to loiter and drink with them unless he was one of them. According to his own counsel, defendant stated without hesitation in a conversation with the special employee that he could get narcotics from the safe burglars who had come into the possession of them through burglary. *According to counsel:* " \* \* \* *and Mr. Moore told him that he could get this stuff and did go and bring it back and sell it to the agent* \* \* \*." The defendant was caught through his confidence in the special employee. Informers have to be base underworld characters with intimate contacts with narcotics peddlers for a Narcotic Agent to make any use of them. Defendant's attorney stated during the sentence proceedings that the informer was "under federal charges in several cases." The record at the sentence proceedings showed that the defendant had the confidence of all those hoodlums—burglars, safecrackers, peddlers in narcotics and marihuana, and informers—and that they likewise had his confidence. However, the record went further than merely showing mutual confidence. The following statement by his counsel indicated a closer bond between the defendant and the criminal element mentioned: " \* \* \* I think he was just playing the role of accommodation in the transfer, with the hope of making a profit for himself." Only a close relationship with people like the ones mentioned above would make a man even consider getting involved in the narcotics traffic to accommodate them.

The opinion was formed at the sentence hearing that the petitioner was a strong leader rather than a follower, and

that his background and disposition were such that he would not have been content with a minor role in the ring of safe-cracking, narcotics burglars with whom he was working. He did not drift into crime, as many do, through lack of ability and training to follow a gainful occupation. He had had the education and experience to make at least a fairly good living lawfully, if he had been content with honest work and a moderate income. He was a confirmed criminal by choice. He was intelligent and had a good appearance. He had front—something that the ordinary burglar lacks—that made him invaluable to his confederates. He could go into a business establishment on the pretense of a lawful purpose, without exciting suspicion, locate the safe, size up the place, and then master-mind the burglary to follow. He knew the work from the ground up from his actual participation in safe burglaries. He was as ruthless as would be expected of a man of his experience and associations. All those things, plus his manner and disposition, made him a natural leader, invaluable to a gang of the kind with which he was associated. When the facts mentioned were added to the further ones that the defendant had a criminal record, experience in crime and intimate connection with the real underworld characters in his community, a person would have had to be naive or inexperienced in the practice of criminal law to have reached any conclusion under the facts of this case other than that the defendant was a principal on equal footing with the other members of this burglary and narcotics ring. The most reasonable conclusion was that he was one of the leaders of it.

The record in the present proceeding identifying, as it does, the defendant's associates and the special agent or informer, and giving for the first time the petitioner's detailed version about the illicit sale, confirms rather than discredits the Court's evaluation of the case at the sentence hearing.

The petitioner's own affidavit attached to his petition herein shows that his cronies with whom he was loitering and drinking at beer lounges were Jerry M. Brown, Jim McFarland, Keith Jernigan, Horace Burt Mullins and Melvin Renfro. His affidavit states that he was seated at a table with them in the H & H Lounge in Fort Worth, when the informer first approached him about the sale of narcotics. The affidavit of Mr. Hardin, a detective in the Narcotics Section of the Fort Worth Police Department, filed in this cause, states that he knows that each of the petitioner's associates above named was a convicted felon, and that the following is a portion of their criminal record: All of them were ex-convicts who had served sentences for burglary. Jernigan had also been convicted of bank robbery. He was killed when caught in the commission of a burglary in Oklahoma. Mullins, Brown and Renfro were convicted in February, 1962 of murdering a policeman in the burglary during which Jernigan was killed. As has been previously stated, it is only common sense that those people would not have accepted and dealt with the petitioner as they did, if he had not been one of their kind.

Petitioner's affidavit filed herein with his petition identifies the special agent or informer as Greg Ainsworth. It states that when the Narcotic Agent originally appeared to be interested only in "hard stuff", and not in the $100 sack of marihuana tendered him, "I told him that I didn't want anything to do with it, but since he was a friend of Greg Ainsworth and that *Greg was a friend of mine*, I would simply do this as a favor." (Emphasis added). Petitioner has filed a supplemental petition with exhibits attached to show the baseness of Ainsworth's character by furnishing the additional information that he was a confessed counterfeiter. That was "Greg", the good friend of the petitioner, one of the underworld characters to whom he felt so obligated that he was compelled to become involved in this illicit traffic only for the purpose of accommodation.

The defendant's only claim for leniency during the sentence hearing was that he did not have a long record of arrests

or convictions, that he was an amateur in crime and had become involved through accident in the offenses for which he had been apprehended. It is not always necessary for a man to have a long record of convictions for a lawyer with adequate experience in criminal law to know that he has been deeply involved in crime, any more than it would be necessary for a sports fan watching Mickey Mantle for the first time in a baseball game to see a paper record to know that Mantle had had considerable experience in the game. An accurate opinion can often be reached from the type of crime with which the defendant has admittedly been connected, from his standing in and connections with underworld characters, and from a close observation of the defendant himself.

At the time of the narcotics transactions alleged in the present indictment, the defendant was on probation under a sentence for a burglary committed for the purpose of cracking a safe. The instances are most rare where a person starts off in burglary with safecracking jobs. It is a type of crime requiring special skill that is not possessed by amateurs. An experienced safecracker would not take a man on a job with him who had not proved himself in ordinary burglaries or in other serious crimes, because safecracking involves more risk than the ordinary burglary. It is the kind of burglary most calculated to result in apprehension and in violence. That kind of burglary usually occurs at night. It is deliberate and well planned in advance. The safecracking is accomplished on the job by skillful manipulation of the combination, which usually requires a light, or by blowing off the combination. Sometimes the safe is hauled away and opened. Any one of the methods is likely to attract attention. There nearly always comes a time, as it did with the petitioner's cronies named in his affidavit, when the burglars are caught in the act and have to shoot it out. For these reasons, an experienced safecracker would not accept a helper unless it was known that he had had enough experience in burgla-

ries or other serious crimes to develop the cold-bloodedness to meet any condition.

The petitioner's own story about the sale of the marihuana shows the falsity of his statement that he was only casually involved in the traffic. The statements of his counsel and those in his own affidavit show that Ainsworth was a hoodlum involved in several serious federal charges; that the Government was using him as a narcotics informer or "special employee"; that he was working with English, a Narcotics Agent. Petitioner's affidavit says that Ainsworth introduced English to the petitioner for the purpose of enabling English to buy some narcotics; that after the meeting, the defendant called a man in the narcotics traffic to find out if it would be safe to deal with English; that when Ainsworth and English came back, petitioner told them he could get some marihuana; that they got into a car driven by the petitioner and went to a house, where petitioner went to the door and got a sack of marihuana from a "girl"; that he got back in the car and drove out in the country, where petitioner pitched the sack to English in the back seat and said, "There it is, look at it"; that English appeared to be interested only in "hard stuff", rather than in marihuana, and petitioner told him if he did not want it, he could return it to the place where he got it; that English finally paid him $100 for the marihuana, and he gave Ainsworth $10 out of the $100.

In the face of these statements in his affidavit, the petitioner now wants someone to believe that he was not deeply involved in the marihuana and narcotics traffic, but that he was only an amateur, making the sale just to favor his friend, Ainsworth. If someone not connected with the traffic in marihuana or narcotics were approached by a person seeking to purchase one or the other of them—

How would he know whom to call to find out about the reliability of the prospective purchaser?

What narcotics supplier would answer such a question by a law-abiding citizen

in a way that would indicate his own connection with the illicit traffic?

How would the amateur have the confidence of the supplier that is required in these illicit transactions?

How could an amateur just go up to a door and knock and have a sack of marihuana handed out to him without paying for it?

Would he know to drive out to the country where there would be less danger of narcotics agents witnessing the delivery?

Would he pitch the sack to the prospective purchaser in the back seat and say, "There it is, look at it"?

Would he be in position to return the marihuana to the place where he got it if the sale did not go through?

The defendant knew better than anyone else what the facts were in connection with the three offenses charged in the indictment in his criminal case. He knew the gravity of what he had done, and had some idea of his own about whether he was really entitled to leniency. The following statement from his own affidavit filed as an exhibit to his present petition shows that the punishment was not anything like as severe as he himself thought the facts would warrant: "* * * I informed Mr. *(attorney)* that in view of the fact that there were two other counts in the indictment against me besides the one on which I was convicted, I felt that I would prefer to plead guilty rather than to try to establish my defense on all three counts, *since I might receive the maximum sentence on each of the counts and have them made to serve one after the other rather than run concurrently * * *."* (Emphasis added).

The Court would have had to disregard the experience of over thirty years in the trial court, with much of it devoted to trial of criminal cases on each side of the docket, to have done other than he did in regard to the sentence in this case.

The petition to set aside the conviction and the request that the petitioner be brought to Fort Worth for a hearing are refused.

This opinion will serve as the findings of fact and conclusions of law.

It is therefore ordered that the petitioner's motion to vacate his sentence be and the same is hereby overruled, this 31st day of December, 1962.